IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| FORTIS ADVISORS, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. _____ |
| ATOS IT SOLUTIONS AND SERVICES, INC., and EVIDEN USA, INC., | § § § § § | |
| Defendants. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Fortis Advisors, LLC ("Plaintiff" or "Fortis"), acting on behalf of the Nimbix Securityholders (as defined below) files this original complaint against Defendants Atos IT Solutions and Services, Inc. and Eviden USA, Inc. ("collectively "Atos" or "Defendants") and would respectfully show the Court as follows:

### I.

### NATURE OF THE ACTION

1. On July 23, 2021, Atos (a U.S. subsidiary of the larger French multinational information technology service company Atos SE) entered an Agreement and Plan of Merger (the "Agreement,"), in which it agreed to purchase Texas-based Nimbix, Inc. ("Nimbix") in exchange for a mix of upfront consideration, namely funds due at closing, and certain agreed-upon "earnouts" that would be paid to the legacy Nimbix Securityholders[1] over the next several years based on the performance of the business that Atos was acquiring.[2]

---

1 The legacy Nimbix shareholders (i.e., those who sold their interests in Nimbix to Atos and who are now owed payment) are known as the "Nimbix Securityholders" under the Agreement. The Nimbix Securityholders, in turn, are represented by Fortis under the Agreement.
2 The Agreement, at §§ 3.1, 3.3.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                                                                                            **PAGE 1**

2. Specifically, the parties agreed to two separate earnouts—one payment that would be due 12 months after closing and a second payment that would be due at the end of the following year—assuming the "Business Unit Revenues" attributable to Nimbix met or exceeded $5 million and $11 million, respectively.[3] If these thresholds were met, the parties would use an agreed-upon formula that would determine the amount owed to the Nimbix Securityholders.

3. Since the acquisition, the Nimbix business has performed incredibly well for Atos. It is one of the few shining assets in a company that is otherwise beset by financial turmoil. Despite this success, Atos has repeatedly and intentionally mismanaged and manipulated the financial results in an attempt to minimize, or avoid paying altogether, the earnout owed to the Nimbix Securityholders.

4. For example, Atos failed to devote appropriate sales resources to the Nimbix business in breach of its obligations under the Agreement. Atos failed to: (i) hire additional sales representatives within three months of the acquisition as required by Section 3.3(d)(i); (ii) use "commercially reasonably efforts to conduct the sale of products . . . at arm's length prices," as required by Section 3.3(d)(ii) of the Agreement; and (iii) manage the business consistent with an agreed-upon Business Plan, as required by Section 3.3(d)(iii).

5. Then, when it came time to report the first earnout amount, Atos claimed it owed nothing to the Nimbix Securityholders. When the Nimbix Securityholders objected and demanded information to backup Atos's "calculation," Atos quickly relented and agreed to pay $6,569,000. In connection with those discussions, the parties modified the Agreement (the "Amendment") to provide that the second earnout "will be shifted to the calendar year 2023, and shall be payable no later than January 31st, 2024. Accordingly, the defined term 'Second Earnout Period' shall be

---

[3] Id., at § 3.3.

**PLAINTIFF'S ORIGINAL COMPLAINT**

deemed to be revised to mean the calendar year 2023, and the Second Earnout Date shall mean December 31, 2023."

6. Even worse, when it came time to report and submit payment for the second earnout, Atos did nothing. It did not supply the required Earnout Notice let alone the Second Earnout Payment. When the Nimbix Securityholders (through counsel) sent a breach notice and demanded a response by February 9, 2024, Atos initially ignored it.

7. Then, on February 22, 2024, Atos send correspondence to Fortis, as representative of the Nimbix Securityholders, claiming that that the Business Unit Revenue did not meet the second earnout threshold, and therefore, Atos owed no Second Earnout Payment at all. This contention is patently false.

8. Atos has breached the Agreement, and the Court should enter judgment for the amount owed to the Nimbix Securityholders, which exceeds $4.75 million.

## II.

## PARTIES

9. Plaintiff Fortis Advisors LLC is an advisory firm that serves as post-closing representatives of selling stockholders in private company mergers and acquisitions. Fortis is a Delaware limited liability company with its principal place of business in San Diego, California. Under the Agreement, Fortis is the designated representative for the Nimbix Securityholders and is authorized to bring this action in that capacity.

10. Defendant Atos is an information technology services company that specializes in cybersecurity, digital consulting, artificial intelligence, and cloud-based solutions. Atos is a Delaware corporation with its principal place of business in Plano, Texas. Atos is a subsidiary of a larger multinational information technology service and consulting company, Atos SE,

headquartered in France. Defendant Atos may be served through its registered agent, CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

11. At the time of the acquisition, Atos SE recognized a specific division called Big Data & Security ("BDS"), which operated the division's supercomputing, High Performance Computing ("HPC") and Artificial Intelligence ("AI") portfolio (collectively the "Advanced Computing Group"). The BDS group pursued and sponsored the Nimbix acquisition to augment its product portfolio and enable it to participate in the market for HPC as a Service ("HPCaaS") and HPC Cloud as well as HPC/AI software. The aforementioned Business Unit Revenue that is subject of the Agreement is reported by Atos to one of its divisions, Bull SAS, which is also headquartered in France.

12. Under the terms of the Agreement, the Nimbix entity was rolled into the North American subsidiary, Defendant Atos IT Solutions & Services. Initially, the former Nimbix employees worked for that entity. However, Atos IT Solutions & Services subsequently became Eviden USA, Inc in March 2023 following an Atos Group corporate restructuring. Today, the former Nimbix employees work within Eviden and report to the executives running the Advanced Computing Group within the larger BDS division. Eviden is a Delaware corporation with its principal place of business in Plano, Texas. Defendant Eviden may be served through its registered agent, CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

### III.

### JURISDICTION AND VENUE

13. Subject matter jurisdiction is proper in this Court under 28 U.S.C. § 1332 because complete diversity exists among the parties, and the value of the relief sought exceeds $75,000 in controversy.

14. Plaintiff Fortis's sole member is a citizen of the State of Pennsylvania; thus, Fortis is deemed to be a citizen of Pennsylvania. *Burdett v. Remington Arms Co., L.L.C.*, 854 F.3d 733, 734 n.1 (5th Cir. 2017); *Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1080 (5th Cir. 2008) (holding the citizenship of an LLC is determined by the citizenship of its members).

15. Defendant Atos is a Delaware corporation with its principal place of business in Plano, Texas; therefore, it is a citizen of Delaware and Texas. Defendant Eviden is a Delaware corporation with its principal place of business in Plano, Texas; therefore, it is a citizen of Delaware and Texas. Accordingly, complete diversity between the parties exists.

16. Jurisdiction is proper over Defendants in this judicial district, and venue is proper under 28 U.S.C. §§ 1391(b) and (c) because Defendants resides in this District and because a substantial part of the events that give rise to Plaintiff's claims occurred in this District.

## IV.

## SUMMARY OF FACTS

17. On July 23, 2021 Nimbix and Atos, along with Fortis as the Nimbix Securityholder Representative, entered into the Agreement. Pursuant to the Agreement, Atos agreed to pay Fortis upfront consideration as well as additional payments based on revenue attributable to the Nimbix product over two periods after the closing date of the Agreement, from July 23, 2021 to July 23, 2022 (the "First Earnout Period") and from July 23, 2022 to July 23, 2023 (the "Second Earnout Period").[4]

18. The Agreement outlined that at the end of each earnout period, Atos would, as promptly as practical, deliver Fortis a notice that "(i) states the amount of the Earnout Payment to be

---

4 The Agreement, at § 3.3.

distributed at such time and (ii) specifies in reasonable detail the Buyer's good faith calculation of such Earnout," but in no event later than 60 days after July 31, 2022 and July 31, 2023.[5]

19. The Agreement also outlined that after the completion of each calendar quarter following the Agreement's closing date, Atos would give Fortis, as the Nimbix Securityholders' Representative, a written calculation of revenue attributable to Nimbix.[6] Similarly, the Agreement bound Atos to promptly provide "all information reasonably requested by the Securityholders' Representative to the Securityholders' Representative, and to make available for inspection and review to the Securityholders' Representative, during regular business hours upon reasonable prior notice, the books and records of the Buyer relating to the Business Unit relevant to the determination of whether the First Earnout Threshold or the Second Earnout Threshold has been satisfied."[7]

**A.    Atos (Initially) Refuses to Pay to Make the First Earnout Payment.**

20. In late 2022, Atos provided Fortis with the First Earnout Notice, which represented "the Business Unit Revenue for the First Earnout Period is equal to *USD0*. Therefore, in accordance with Section 3.3(c)(ii) of the Merger Agreement *no* First Earnout Payment is payable." The notice was not accurate.

21. On October 5, 2023, Fortis exercised its information rights under Section 3.3(h) of the Agreement and demanded Atos provide it with:

> 1.    All data and any calculations made by Atos supporting its determination that the Business Unit Revenue was $0 during the First Earnout Period;
>
> 2.    Any and all communications regarding Atos's analysis and determination of the Business Unit Revenue for the First Earnout Period, including any alternative calculations that were modified or rejected;

---

5 Id., at § 3.3(g)(i).
6 Id., at § 3.3(f).
7 Id., at § 3.3(h).

3.   Any assumptions or interpretations of the Merger Agreement made by Atos regarding its definition of "Business Unit Revenue" when it determined the business unit had generated $0 in revenue or sales;

4.   A list of any and all third parties that have used products or services offered by Atos's High Performance Computing Cloud Competency Center ("HPC Cloud") during the last 12 months, including but not limited to HPC Cloud, HPC as a Service (HPCaaS), Jarvice XE, or any legacy Nimbix products;

5.   Any contracts, agreements, purchase orders, or invoices between Atos and any third parties that use or license HPC Cloud products or services;

6.   Documents sufficient to reflect any revenue from or sales to third parties (including new bookings) that use or intend to use or license HPC Cloud, HPCaaS, and/or Nimbix products or services;

22.   In response, Atos provided scant backup for its position. Fortis requested a call to discuss Atos's position, which Atos initially ignored, despite the cooperation clauses in the Agreement. When Atos finally responded, it agreed to update the Earnout Notice. On November 23, 2023—after additional stalling and ignored requests—Atos finally agreed to pay more than $6.5 million (although denying it owed Fortis anything).

23.   In connection with those discussions, the parties agreed to the Amendment, which modified the calculation of the Second Earnout Period. As amended, the second earnout period is calculated using the 2023 calendar year, i.e., January 1, 2023 through December 31, 2023 and provides that the second earnout would be *payable no later than January 31, 2024* (the "Amended Second Earnout Period").

**B.   Atos's Breaches of the Agreement to Avoid the Second Earnout Payment.**

24.   Under the terms of the Agreement, the "Business Unit Revenue" threshold for the Second Earnout Period is $11,000,000.[8]

---

8 Id., at § 3.3(c)(v).

25. During the Amended Second Earnout Period from January 1, 2023 to December 31, 2023, upon information and belief, Nimbix's product strengthened Atos's business and saw strong sales activity overall. Despite the fundamental strength of the business, Atos engaged in multiple breaches of its obligations under the Agreement in order to avoid having to make the Second Earnout Payment.

26. First, Atos failed to hire the additional sales team members that had been promised under the Agreement, which impeded additional sales efforts.[9] Worse, Atos has subsequently depleted or reassigned the existing workforce committed to Nimbix. By way of example, during the Atos/Eviden restructuring, the company instituted draconian cuts, including preventing any investment in sales and marketing, which significantly impaired the Business Unit's ability operate, let alone drive sales that would count toward a future earnout. Other members of the sales team were committed to other Atos priorities, including RFPs for procurements well-outside the earnout period, or assigned to other business units altogether. In approximately May of 2022, Atos inexplicably caused Nimbix to remove its website at https://www.nimbix.net, a substantial marketing asset for driving sales, while other Atos acquisitions, such as Ipsotek and DataSentics, were still able to market their offerings via their respective websites. Only after Nimbix management pushed, despite opposition from Atos Group, did its website get reinstated around July of 2022.

27. Second, Atos agreed it "will not and, to the extent applicable, will cause its affiliates not to take (or refrain from taking) any action(s) with the intent of reducing or eliminating the Earnout Payments."[10] However, upon information and belief, throughout the Earnout Period, Atos specifically asked members of the Buying division to change their position to reduce Business Unit Revenues to avoid earn out payment for the First Earnout Period and even asked team members to

---

9 Id., at § 3.3(d)(i).
10 Id., at § 3.3(d)(ii).

provide backup for results that Atos knew were incorrect. These actions included members of the Atos team encouraging Nimbix management to consider taking payments to employees rather than to Nimbix shareholders, as the Merger Agreement required. Atos then used those artificially depressed results to initially report "zero" earnout payments in that First Earnout Period, which necessitated intervention by Fortis.

28. Third, Atos agreed that during the Earnout Period, "it shall and shall cause its affiliates (including the Surviving Corporation), to use commercially reasonable efforts to conduct the sale of the Business Unit's products and services to third party customers at arm's length prices. . . ."[11] But over the last year, Nimbix Securityholders have documented a clear pattern and practice whereby Atos inexplicably impeded commercial operations of the Nimbix entity. For example, in 2023, Atos refused Nimbix management's preferred datacenter partner for migrating cloud operations while consistently delaying the unit's ability to migrate customers to save money for Atos and grow revenue at a faster rate. In another instance, Atos contributed a Nimbix product license at zero cost to help support the French CLUSSTER research & development project, as well as intellectual property, technology, and personnel resources. (See https://www.hpcwire.com/off-the-wire/clusster-project-french-consortium-leads-the-way-in-ai-and-quantum-cloud-development/). There is nothing "arms-length" about giving away licenses to Nimbix's valuable and technologically critical products. Even if Atos wanted to do that to secure the business, it was incumbent on Atos to enter an accounting adjustment in its earnout calculation such that the total value of Nimbix software and intellectual property would be fairly reflected based on the value received by Atos.

29. Fourth, Atos agreed to "use its commercially reasonable efforts to, and to cause its affiliates to, operate the Surviving Corporation substantially in compliance with the Business Plan, including with respect to investing aggregate amounts in the Surviving Corporation that are

substantially consistent with the Business Plan."[12] Again, Atos breached this obligation in multiple instances, including failure to invest in R&D and Service Delivery resources required to support accelerating revenue growth per the business plan. Atos also attempted to prevent the retention of key R&D developer who had been with Nimbix for 10 years and contracted via Newt Global, even though Nimbix management stated many times over the criticality of the resource.

30. Fifth, Atos agreed to provide to the Securityholders' Representative a written calculation of Company revenue no later than 45 days after the completion of each calendar quarter following the closing of the Merger.[13] Atos consistently failed to do so, presumably to frustrate the representatives' ability to monitor or detect the other breaches set forth above and otherwise obscure its actions to diminish or attempt to eliminate any earn-out payments.

C. **Atos Fails to Make the Second Earnout Payment.**

31. Despite the aforementioned breaches of the Agreement by Atos, the Nimbix team was still able to meet the $11 million revenue threshold. On October 27, 2023, Steve Hebert, former Chief Executive Officer of Nimbix, notified Atos leadership that the revenue attributable to Nimbix had surpassed the $11 million threshold to achieve a minimum earn out payment for Nimbix Securityholders of $4.75 million per the Agreement.[14]

32. In response, Atos asserted that certain revenues in Mr. Hebert's calculation would not be applied to the $11 million threshold because it was not considered "recognized" the revenue for the Amended Second Earnout Period. When Mr. Hebert questioned Atos's position, members of the Atos team said that the executive team had made clear in meetings that they would do whatever it takes to avoid paying *any* earnout to the Nimbix Securityholders, just like they had tried with respect to the First Earnout, and would use these false numbers to negotiate a lower amount.

---

11 Id.
12 Id., at § 3.3(d)(iii).

33. Then, on January 31, 2024, Atos breached the Agreement by failing to provide the Second Earnout calculation, let alone payment. Despite its prior agreement to do so, Atos failed to timely send Fortis or Nimbix Securityholders *any* reports, calculations of revenue, or information.

34. On February 1, 2024, Fortis provided written notice of Atos's material breach of the Agreement and requested a statement of the earnout calculation and the required Second Earnout Payment of a minimum of $4.75 million.

35. Atos initially ignored that demand and instead, an Atos employee informed a Fortis representative that it required an "audit" before any revenue report or information could be provided. Nothing in the Agreement, or the Amendment, requires an audit before reporting the revenue attributable to Nimbix. Fortis sent a second breach notice to Atos on February 9, 2024, in which it once more demanded the aforementioned statement and explained why no such audit was required under the Agreement.

36. Finally, on February 22, 2024, Atos delivered to Fortis, on behalf of the Securityholders, a written notice for the Second Earnout Period alleging that the Second Earnout calculation is $7,991,000.00 – less than the requisite $11 million – and, therefore, Atos is not required to make any Second Earnout Payment.

37. Atos's calculation is grossly incorrect; again, the objective data proves that the revenue attributable to Nimbix for the Second Earnout Period exceeded $11 million. Atos's calculation was falsely generated for the specific purpose of not making any payment to Fortis and the Securityholders for the Second Earnout Period in material breach of the Agreement.

38. On February 23, 2024, Fortis delivered correspondence to Atos explaining how Atos had deliberately omitted certain sources of revenue from the Business Unit Revenue and demanding

---

13 Id., at § 3.3(f).
14 Id., at § 3.3(b)(ii).

that Atos recognize such revenue which, if properly done, would bring the revenue level well above the $11 million threshold. Fortis further demanded that Atos immediately revise the Second Earnout Notice accordingly to include all applicable sources that qualify as Business Unit Revenue as defined in the Agreement. To date, Atos has refused to respond or to revise the Second Earnout Notice and is therefore in material breach of the Agreement.

V.

## CAUSES OF ACTION

**COUNT ONE – Breach of Contract**

39. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs.

40. Fortis and Atos are parties to the Agreement (as amended by the Amendment), which is a valid and enforceable contract binding on Atos.

41. Fortis and the Nimbix Securityholders have fully performed their obligations under the Agreement.

42. Atos has materially breached the Agreement as more particularly described in the foregoing paragraphs by, among other things, failing to hire the promised sales representatives, failing to use commercially reasonable efforts to sell Nimbix product at arm's length pricing, failing to use commercially reasonable efforts in adhering to the agreed-upon business plan, and failing to deliver payment of up to $9.25 million and no less than $4.75 million to Fortis as the securityholder's representative for the Second Earnout payment.

43. As a proximate result of Atos's acts or omissions, Fortis and the Nimbix Securityholders have been damaged in an amount in an amount to be proven at trial, for which they now sue.

**COUNT TWO – Breach of the Covenant of Good Faith and Fair Dealing**

44. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs.

45. In addition or in the alternative to its cause of action for breach of contract, Fortis pleads as follows. The Agreement contains an implied covenant of good faith and fair dealing that, among other things, prohibits Atos from acting or failing to act in a manner that has the effect of destroying or injuring Nimbix Securityholders' right to receive the benefits of the Agreement.

46. Atos breached the implied covenant of good faith and fair dealing as more particularly described in the foregoing paragraphs by, among other things, artificially deflating revenue attributable to Nimbix and frustrating Fortis's exercise of Nimbix Securityholders' Second Earnout payment rights.

47. As a proximate result of Atos's acts or omissions, Fortis and the Nimbix Securityholders have been damaged in an amount in an amount to be proven at trial, for which they now sue.

## VI.

## ATTORNEY'S FEES

48. Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs.

49. Plaintiff has found it necessary to employ the services of the undersigned attorneys to represent it and has agreed to pay the reasonable fees and expenses incurred in prosecuting this matter. Plaintiff seeks recovery of its attorney's fees and costs incurred in prosecution of this matter against Defendants under the terms of the parties' Agreement, Section 38.001 of the Texas Civil Practice & Remedies Code, and under any other applicable provision at law or equity.

# VII.

# **CONDITIONS PRECEDENT**

50. All conditions precedent to Plaintiff's recovery have been performed or have occurred.

# VIII.

# **PRAYER**

Plaintiff prays that it has judgment against Defendants, jointly and severally, for the following:

1. Actual damages in an amount in excess of the minimum jurisdictional limits of the Court;

2. Reasonable and necessary attorney's fees;

3. Pre-judgment interest at the rate of five percent (5%) per annum, or at the highest rate allowed by law;

4. Post-judgment interest at the rate of five percent (5%) per annum, or at the highest rate allowed by law;

5. The award of all costs; and

6. All further relief to which Plaintiff may be justly entitled at law or equity.

Respectfully submitted,

By: */s/ Eric C. Wood*
Eric C. Wood
State Bar No. 24037737
eric@brownfoxlaw.com
BROWN FOX PLLC
6303 Cowboys Way, Suite 450
Frisco, Texas 75034
Phone: (214) 327-5000
Fax: (214) 327-5001

ATTORNEYS FOR PLAINTIFF
FORTIS ADVISORS, LLC