# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| FORTIS ADVISORS, LLC, § § *Plaintiff,* § § v. § § ATOS IT SOLUTIONS AND § SERVICES, INC., and EVIDEN USA § INC., § § *Defendants.* § | Civil Action No. 4:24-cv-186 Judge Mazzant |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Motion to Compel Arbitration and Dismiss this Action or, Alternatively, to Dismiss as to Defendant Eviden USA, Inc. for Failure to State a Claim and to Stay Pending Arbitration (Dkt. #14). Having considered the Motion and the relevant pleadings, the Court finds that the Motion should be **DENIED**.

## BACKGROUND

### I.   Factual Background

This is a dispute arising out of a merger between two information-technology and software companies: Atos IT Solutions and Services, Inc. ("Atos") and Nimbix, Inc. ("Nimbix") (*See* Dkt. #1). Under the Agreement and Plan of Merger ("Merger Agreement"), Atos agreed to purchase Nimbix in exchange for a "mix of upfront consideration, namely funds due at closing, and certain agreed-upon 'earnouts' that would be paid to the legacy Nimbix Securityholders[1] over the next

---

[1] Plaintiff's Original Complaint defines "Nimbix Securityholders" as "those who sold their interests in Nimbix to Atos and who are now owed payment" (Dkt. #1 at p. 1 n.1). Plaintiff Fortis Advisors LLC ("Fortis") "is an advisory firm that serves as post-closing representatives of selling stockholders in private company mergers and acquisitions" (Dkt. #1 at ¶ 9). Fortis is authorized to bring suit against Atos in that capacity.

several years based on the performance of the business that Atos was acquiring" (Dkt. #1 at p. 1). The parties took to federal court on March 1, 2024 due to multiple alleged breaches of the Merger Agreement (Dkt. #1).

The issue that the Court must resolve today is one of contract interpretation. The Merger Agreement that Atos and Fortis executed contemplated "earnout" payments tied to the revenue attributable to the Nimbix product (Dkt. #1 at p. 5). The "earnout" payments would become due in two installments—at the end of the "First Earnout Period" (July 23, 2021 to July 23, 2022) and at the end of the "Second Earnout Period" (July 23, 2022 to July 23, 2023) (Dkt. #1 at p. 5). At the end of each period, Atos agreed to deliver Fortis a notice (the "Earnout Notice") that "(i) states the amount of the Earnout Payment to be distributed at such time and (ii) specifies in reasonable detail the Buyer's good faith calculation of such Earnout" (Dkt. #14-2 at p. 37).

In 2022, Atos submitted its first Earnout Notice for the First Earnout Period (Dkt. #1 at ¶ 20). The Notice inaccurately stated that the first Earnout Payment would be $0 (Dkt. #1 at ¶ 20). Accordingly, Fortis requested detailed information supporting the calculation of the first Earnout Payment (Dkty. #20 at ¶ 21). Finally, after months of lengthy discussions—and despite maintaining that it did not owe Fortis any payment—Atos ultimately agreed to pay Fortis more than $6.5 million for the first Earnout Payment (Dkt. #1 at ¶ 22). Given the delay caused by the late payment of the first Earnout Payment, the parties agreed to amend the Merger Agreement to modify the calculation of the Second Earnout Period, which they agreed to update to the 2023 calendar year (January 1, 2023 through December 31, 2023), with payment due no later than January 31, 2024 (Dkt. #1 at ¶ 22).

During the Second Earnout Period, Fortis contends that Atos breached the Merger Agreement multiple times in an apparent attempt to prevent Nimbix from hitting the $11 million Business Unit Revenue threshold and, in turn, triggering its obligations to pay the second Earnout Payment (Dkt. # 1 at pp. 7–10; Dkt. #14-2 at pp. 35–36). First, Fortis contends that Atos failed to hire additional sales team members that it promised to hire under the Merger Agreement, thereby hindering the Nimbix's sales efforts (Dkt. #1 at ¶ 26). Second, Fortis argues that, in violation of the Merger Agreement, Atos has attempted to reduce or eliminate its Earnout Payments by convincing certain employees to artificially underreport certain Business Unit Revenue figures (Dkt. #1 at ¶ 27). Third, Fortis alleges that Atos has "impeded commercial operations of the Nimbix entity" by breaking its promise to "use commercially reasonable efforts to conduct the sale of the Business Unit's products and services to third party customers at arm's length prices" (Dkt. #1 at ¶ 28). Fourth, Fortis avers that Atos breached its obligation to invest in Nimbix by avoiding investment in research and development and service delivery resources that directly influence the acceleration of revenue growth (Dkt. #1 at ¶ 29). Fifth and finally, Fortis contends that Atos has consistently failed to provide a written calculation of company revenue within 45 days of each quarter's end, as it promised to do under the Merger Agreement (Dkt. #1 at ¶ 30).

The proverbial straw that broke the camel's back came on January 31, 2024, when Atos allegedly breached the Merger Agreement by withholding the Second Earnout calculation to which Fortis was entitled due to Nimbix's revenue surpassing the $11 million threshold (Dkt. #1 at ¶¶ 31, 34). After Fortis requested the calculation, Atos delivered written notice that Fortis would not be entitled to any earnout payment because the Second Earnout calculation totaled $7,991,000—well below the $11 million threshold (Dkt. #1 at ¶ 36). Fortis contends that Atos's calculation was

"falsely generated for the specific purpose of not making any payment to Fortis and the Securityholders for the Second Earnout Period in material breach of the Agreement" (Dkt. #1 at ¶ 37). Fortis sued to enforce the Merger Agreement.

## II.    Procedural History

Fortis filed suit against Atos on March 1, 2024 (Dkt. #1). Fortis's Original Complaint brings claims for breach of contract and breach of the covenant of good faith and fair dealing (Dkt. #1 at pp. 12–13). In lieu of filing an answer, Defendants[2] filed a motion to compel arbitration and dismiss the action pursuant to Rule 12(b)(3) or, alternatively, to dismiss as to Eviden USA under Rule 12(b)(6) (Dkt. #14).

Defendants point to two provisions in the Merger Agreement in support of their motion to compel arbitration. First, they point to § 3.3(g)(ii), which provides the following:

> The Securityholders' Representative shall have thirty (30) days after delivery of the Earnout Notice to deliver to the Buyer in writing any objection thereto. Any such objection shall be in reasonable detail and include the specific component or components of the Buyer's Earnout calculation in dispute (if capable of being known based on the information provided (or not provided) by the Buyer). If the Securityholders' Representative objects in writing to any calculations in the Earnout Notice prior to the expiration of such thirty (30) day period, the Buyer and the Securityholders' Representative shall resolve such conflict in accordance with the procedures set forth in Section 3.2(c), *mutatis mutandis*.

(Dkt. #14-2 at p. 37). Then, they direct the Court to § 3.2(c) of the Merger Agreement, which provides, in pertinent part:

> ***Dispute Resolution***. If the Buyer and the Securityholders Representative are unable to resolve any Dispute[3] within the 30-day period after the Securityholders'

---

[2] As explained in Fortis's Original Complaint, Defendants are Atos and Eviden USA, Inc (Dkt. #1 at p. 1). According to Fortis, "Atos IT Solutions & Services subsequently became Eviden USA, Inc following an Atos Group corporate restructuring" (Dkt. #1 at ¶ 12).

[3] Notably, the Merger Agreement defines "Dispute" as "[a] dispute in writing [regarding] any of the elements of or amounts reflected on the Closing Date Statement and affecting the calculation of the Working Capital" (Dkt. #14-2 at p. 23).

> Representative's delivery of a Dispute Notice, the Securityholders' Representative and the Buyer shall jointly engage BDO USA LLP (the "***Arbitrating Accountant***"), *acting as an expert and not an arbitrator* to promptly resolve any Disputes. . . . The Arbitrating Accountant shall allow the Buyer and the Securityholders' Representative to present their respective positions regarding the Dispute. The Arbitrating Accountant may, at its discretion, conduct a conference concerning the Dispute, at which conference each of the Buyer and the Securityholders' Representative shall have the right to present additional documents, materials and other information and to have present its advisors, counsel and accountants. In connection with such process, there shall be no other hearings or any oral examinations, testimony, depositions, discovery or other similar proceedings. The Arbitrating Accountant shall only decide the specific items under Dispute by the Parties and its decision for any item in the Dispute Notice must be within the range of values assigned to each such item in the Closing Date Statement and Dispute Notice, respectively. The Arbitrating Accountant shall thereafter promptly render its decision on the question in writing and finalize the Closing Date Statement. Such written determination shall be final and binding upon the Parties for purposes of this Agreement, and judgment may be entered on the determination. . . .

(Dkt. #14-2 at p. 32) (emphasis added). As Defendants see it, §§ 3.2(c) and 3.3(g)(ii) demand the parties to arbitrate this dispute because it hinges upon "the determination of the seller's entitlement to an earnout payment in a merger agreement" (Dkt. #14 at p. 16). Fortis sees it much differently. To Fortis, arbitration is not necessary—and, in fact, would be improper—because (1) § 3.2(c) is not an agreement to arbitrate, and (2) even if it were, the current dispute is outside of its scope (Dkt. #21 at pp. 9–19).

Defendants also move to dismiss Eviden from this action under Rule 12(b)(6) due to Fortis's failure to state a claim against Eviden (Dkt. #14 at p. 25). Defendants contend that Eviden is an improper party because it was not a party to the Merger Agreement (Dkt. #14 at p. 25). Fortis opposes dismissal on the grounds that it has adequately pleaded a claim against Eviden due to Texas's successor liability laws (Dkt. #21 at pp. 20 – 21) (citing TEX. BUS. ORGS. CODE § 10.254(b); *Cortes-Castillo v. One Time Constr. Tex. LLC*, No. 3:21-CV-2093-BH, 2023 WL 4566257, at *20 (N.D. Tex. July 17, 2023)).

# LEGAL STANDARD

## I. Motion to Compel Arbitration

Under the Federal Arbitration Act ("FAA"), "parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). The FAA provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The FAA was designed to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (internal quotations omitted). Thus, the FAA establishes "'a liberal federal policy favoring arbitration agreements.'" *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Because arbitration is a creature of contract, the FAA "requires courts to enforce agreements to arbitrate according to their terms." *CompuCredit Corp.*, 565 U.S. at 98 (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

Although there is a strong federal policy favoring arbitration, the policy "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 516 n.5 (5th Cir. 2019) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)). The FAA "does not require parties to arbitrate when they have not agreed to do so." *Volt*, 489 U.S. at 478 (citing *Byrd*, 470 U.S. at 219). Rather, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf*

*Nav. Co.*, 363 U.S. 574, 582 (1960). The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt*, 489 U.S. at 478 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967))

When considering a motion to compel arbitration, courts apply a two-step framework. First, the Court must determine "whether the parties entered into any arbitration agreement at all." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). "This first step is a question of contract formation only—did the parties form a valid agreement to arbitrate some set of claims." *IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017), *cert. denied*, 584 U.S. 1031 (2018). This initial question is for the Court. *Kubala*, 830 F.3d at 201. To determine whether there is a valid agreement to arbitrate, courts "'apply ordinary state-law principles that govern the formation of contracts.'" *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 939 (1995)).

If the Court finds that there is a valid agreement to arbitrate, it proceeds to the second question: whether the claim at issue is covered by the arbitration agreement. *IQ Prods.*, 871 F.3d at 348. In the second step, the Court must determine "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Webb*, 89 F.3d at 258 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). This second question usually is for the Court, unless the arbitration clause contains a valid delegation clause for an arbitrator to determine whether the claim falls within the arbitration agreement. *Kubala*, 830 F.3d at 201–02.

The party seeking to compel arbitration must prove the existence of an agreement to arbitrate by a preponderance of the evidence. *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir.

7

2012). Once the Court determines that there is a valid agreement to arbitrate, the strong federal policy favoring the enforcement of the arbitration agreements applies, and all ambiguities must be resolved in favor of arbitration. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004) (citing *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002)). As the Supreme Court has stated: "'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960)). Because of the strong presumption in favor of arbitration, the party opposing arbitration bears the burden to demonstrate either that the agreement is invalid or that the claims are outside of the agreement's scope. *See Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004).

## II.    12(b)(6)

The Federal Rules of Civil Procedure require that each claim in a complaint include a "short and plain statement . . . showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen,* 681 F.3d 215, 219 (5th Cir. 2012). The Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that

8

are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face. "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id*. "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570).

9

# ANALYSIS

The instant dispute hinges on the validity and applicability of the Dispute Resolution Provision contained in § 3.2(c) of the Merger Agreement (*See* Dkt. #14-2 at p. 32). The Court's analysis focuses only on two questions: "(1) is there a valid agreement to arbitrate the claims; and (2) if so, does the dispute in question fall within the scope of that arbitration agreement." *See Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008). As the following discussion will demonstrate, the Dispute Resolution Provision fails under the first prong, so the Court need not turn to the second.

## I.  Motion to Compel Arbitration

The first question for the Court is whether there is "any arbitration agreement at all." *Kubala*, 830 F.3d at 201. Defendants assert that the FAA, rather than Delaware state law, applies to determine whether the parties entered an agreement to arbitrate (Dkt. #14 at p. 17). Defendants are wrong. The FAA's two-step framework requires courts to apply state law principles to determine whether the parties agreed to arbitrate to begin with. *See Graves v. BP Am., Inc.*, 568 F.3d 221, 222 (5th Cir. 2009) (quoting *First Options of Chi.*, 514 U.S. at 939 ("In assessing whether there is a valid agreement to arbitrate, courts apply 'ordinary state-law principles that govern the formation of contracts.'")). The question, then, is which state's law applies? To answer that question, the Court must first perform an *Erie* analysis.

Under the *Erie* doctrine, federal courts sitting in diversity apply the substantive law of the state in which they sit, which in this case is Texas. *Exxon Corp. v. Burglin*, 42 F.3d 948, 950 (5th Cir. 1995) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Texas law generally enforces contractual choice-of-law provisions. *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 324 (Tex. 2014); *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). That is what the parties agreed to

here. The Merger Agreement contains a choice-of-law clause providing that "[t]his Agreement shall be governed and construed in accordance with the Laws of the state of Delaware applicable to contracts to be wholly performed within the State of Delaware" (Dkt. #14-2 at p. 90). Atos does not dispute the *validity* of the choice-of-law provision but simply challenges its application to the arbitration provision given that it appears "50 pages away" in the agreement (Dkt. #25 at p. 7).

Atos's principal challenge to the choice-of-law provision is that neither Texas law nor Delaware law should apply. Instead, Atos insists that the FAA kicks in to prevent enforcement of the choice-of-law provision (Dkt. #14 at pp. 17–18; Dkt. #25 at pp. 7–8). But the FAA does not apply at this stage. At this preliminary stage, where the Court's task is to determine whether an agreement to arbitrate exists, state contract law applies. *Kubala*, 830 F.3d at 202 (citing *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 205 (5th Cir. 2012)). The FAA determines questions of arbitration *after* a court determines—by applying ordinary state law principles—whether an agreement to arbitrate exists. *See id.* at 201–03. The threshold question, still, is whether § 3.2(c) of the Merger Agreement qualifies as a valid arbitration agreement. The Court applies Texas law to determine whether to enforce the choice-of-law provision which, in turn, informs the Court how to interpret § 3.2(c). *See Burglin*, 42 F.3d at 950 (citing *Erie*, 304 U.S. at 64). As mentioned, Texas law typically enforces choice-of-law provisions, unless the party opposing its application demonstrates that the law of the chosen state violates some fundamental public policy of Texas or that the chosen state has no substantial relationship to the dispute. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990); *see also Cardoni v. Prosperity Bank*, 805 F.3d 573, 581 (5th Cir. 2015) (collecting cases). Atos has not even attempted to argue either. Accordingly, the Court

11

will enforce the choice-of-law provision and use Delaware law to determine whether § 3.2(c) is a valid arbitration agreement. As the Court explains below, it is not.

### A. The Alleged Arbitration Agreement

The provision that Defendants seek to enforce is found in § 3.2(c) of the Merger Agreement under the title "Post-Closing Adjustments" (Dkt. #14-2 at p. 31). Specifically, § 3.2(c) covers "Dispute Resolution" for any disputes that may arise related to the calculations reflected in the Closing Date Statement (Dkt. #14-2 at p. 32). Section 3.2(c) provides that any disputes related to the calculation of earnout payments must be resolved by an "Arbitrating Accountant" (*See* Dkt. #14-2 at p. 32). In describing the role of the "Arbitrating Accountant," § 3.2(c) of the Merger Agreement states that they are to "[act] as an *expert and not an arbitrator* to promptly resolve any Disputes" (Dkt. #14-2 at p. 32) (emphasis added). Fortis characterizes that language as being fatal to Defendants' Motion. The Court agrees.

Delaware caselaw makes clear that if parties wish to specify that they are invoking the work of an expert, rather than an arbitrator, then they should use "expert not arbitrator language." *See Bus Air, LLC v. Antony R. Woods & E3 Rivers, LLC*, No. CV 19-1435-RGA-CJB, 2021 WL 9598626, at *11 (D. Del. Jan. 28, 2021); *see also Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch. 2018) (holding that no agreement to arbitrate existed where the contract expressly stated that "the Accounting Firm shall be acting as an accounting expert only and not as an arbitrator"). The parties did so here. Though § 3.2(c) refers to the third-party expert as an "Arbitrating Accountant" whose "written determination shall be final and binding upon the Parties" such that "judgment may be entered on the determination," that language is not dispositive (Dkt. #14-2 at p. 32). And here, because the Dispute Resolution provision calls for the work of an "expert" and explicitly disclaims the role of an "arbitrator," the Court will not construe

it as an arbitration agreement (Dkt. #14-2 at p. 32). *See EMSI Acquisition, Inc. v. Contrarian Funds, LLC*, No. CV 12648-VCS, 2017 WL 1732369, at *16 (Del. Ch. May 3, 2017) (stating that "it cannot be the case" that an expert's decision in a dispute resolution proceeding is tantamount to an arbitration "where the contract language on point expressly states that the auditor/expert is not acting as an arbitrator"). At bottom, "[a]n expert determination . . . is not an arbitration unless the parties specifically 'designate the expert as an arbitrator for that purpose.'" *Penton*, 252 A.3d at 458 (quoting *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*, No. CIV.A. 4586-CS, 2013 WL 1955012, at *25 (Del. Ch. May 13, 2013)). The parties here did not designate the Arbitrating Accountant to act as an arbitrator, despite having ample opportunity to do so, if they so desired. Section 3.2(c) is, therefore, an expert determination procedure, not an agreement to arbitrate.

At the very least, the language calling for an Arbitrating Accountant who is to act as an expert rather than an arbitrator creates an ambiguity. And in Delaware, courts routinely refuse to enforce a contract provision that "unclearly or ambiguously reflects the intention to arbitrate." *Kuhn Const. Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010); *see also DMS Props. First, Inc. v. P.W. Scott Assocs.*, Inc., 748 A.2d 389, 391 (Del. 2000) ("A party cannot be forced to arbitrate the merits of a dispute . . . in the absence of a clear expression of such intent in a valid agreement."). The "unclear" and "ambiguous" intent to arbitrate found in § 3.2(c) of the Merger Agreement is just the sort of provision that Delaware Courts have repeatedly refused to enforce. *See Kuhn Const. Inc.*, 990 A.2d at 396. The Court will follow suit here.

  **B.**  **The Scope of Authority Granted to the "Arbitrating Accountant"**

The Court's conclusion above finds further support when considering the narrow scope of disputes covered by § 3.2(c) of the Merger Agreement. Defendants assert that in the event that Fortis objects to any calculations in the Earnout Notice, § 3.3(g)(ii) of the Merger Agreement

13

states that any such conflict shall be resolved "in accordance with the procedures set forth in Section 3.2(c)," the Dispute Resolution provision (Dkt. #14 at p. 11). But because only one particular factual dispute is directed to the Arbitrating Accountant under § 3.2(c) (the calculations reflected in the Closing Date Statement), this would suggest that § 3.2(c) is not the arbitration agreement that Defendants claim it to be. *See Bus Air LLC*, 2021 WL 9598626, at *12 (stating that "Delaware law indicates that the 'type and scope of authority' granted to a decision maker can be an important clue as to whether the parties agreed to arbitration.") (quoting *Penton*, 252 A.3d at 464). Here, the Dispute Resolution provision provides that the Arbitrating Accountant is to "promptly resolve any Disputes" (Dkt. #14-2 at p. 32). Ordinarily, this would suggest that there is a valid arbitration agreement because "arbitration provisions typically broadly encompass the entire legal and factual dispute between the parties." *Ray Beyond Corp. v. Trimaran Fund Mgmt., LLC*, No. CV 2018-0497-KSJM, 2019 WL 46614, at *8 (Del. Ch. Jan. 29, 2019). But § 3.2(c) does not paint with such a broad brush. On the contrary, the Arbitrating Accountant is not to resolve *all* disputes relating to the *entire* Merger Agreement, but is simply intended to resolve any "Dispute," as that term is narrowly defined in § 3.2(b) (Dkt. #14-2 at p. 32). That Section specifically defines "Dispute" to mean "elements of or amounts reflected on the Closing Date Statement and affecting the calculation of the Working Capital" (Dkt. #14-2 at p. 31). Thus, the Arbitrating Accountant's decision-making authority under § 3.2(c) is limited to disagreements over the earnout calculations. *See Penton*, 252 A.3d at 464 (explaining that if "the authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation," it would suggest that an "expert determination" is all that the parties intended). Accordingly, the Arbitrating

Accountant's narrow decision-making authority suggests that the Parties agreed to an expert determination rather than an arbitration.

As the Court already briefly discussed, Defendants next assert that because the decision of the Arbitrating Accountant is to be final and binding on the Parties under § 3.2(c) of the Merger Agreement, the Parties entered into an agreement to arbitrate (Dkt. #14 at p. 20). Not so. The fact that the Arbitrating Accountant possesses final decision-making authority on a single factual dispute does not give it cart blanche authority to make final decisions on *all* disputes. *See Kuhn Const. Inc.*, 990 A.2d at 394–95, 397 (overturning the lower court's grant of a motion to compel arbitration, despite the third party being permitted to make "final and binding" decisions on certain matters, in light of other evidence suggesting that an arbitration agreement had not been reached). Accordingly, because of the other evidence in this case suggesting that an arbitration agreement has not been reached, the fact that the Arbitrating Accountant has the ability to make a "final and binding" decision on one issue does not give it authority to resolve all others.

Finally, the Court adds that arbitration is improper here because this dispute encompasses far more than the miscalculation of earnout payments. Defendants seek to simplify the issues giving rise to this lawsuit in an attempt to shoehorn all of them into a single arbitration (Dkt. #14 at p. 7) (alleging that Fortis "filed this action alleging that it is owed an 'Earnout' payment under an Agreement and Plan of Merger"). But that is not all that Fortis alleges. Indeed, Fortis's Complaint alleges multiple breaches of the Merger Agreement that go beyond Atos's alleged underpayment of earnout amounts (*See* Dkt. #1). There is no valid arbitration agreement here—the Arbitrating Accountants authority over a narrow category of disputes compels the conclusion that the parties agreed to an expert determination.

Having determined that the purported "arbitration agreement" contained in § 3.2(c) of the Merger Agreement fails the first prong of the analysis, the Court need not address the second prong. There is no agreement to arbitrate, so there is no need to determine whether the current dispute falls within its scope.

## II.     Motion to Dismiss Eviden

Next, the Court considers whether it should dismiss Eviden under Rule 12(b)(6) due to Fortis's alleged failure to state a claim against Eviden because it was not a party to the Merger Agreement (Dkt. #21). After a careful review of Fortis's Original Complaint, the Court is not persuaded. Fortis is permitted to plead in the alternative, and after reviewing the relevant pleadings and the arguments contained in the briefing, the Court finds that Fortis has stated a plausible claim for relief against Eviden for purposes of defeating a Rule 12(b)(6) motion.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Motion to Compel Arbitration and Dismiss this Action or, Alternatively, to Dismiss as to Defendant Eviden USA, Inc. for Failure to State a Claim and to Stay Pending Arbitration (Dkt. #14) is hereby **DENIED**.

**IT IS SO ORDERED.**

**SIGNED this 7th day of August, 2025.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE